## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| SHAWN MCBREAIRTY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket No. 1:23-cv-00143-NT |
| | ) | |
| HEATH MILLER and | ) | |
| SCHOOL BOARD OF RSU22, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER ON PLAINTIFF'S EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Before me is Plaintiff Shawn McBreairty's motion (ECF No. 3) for a temporary restraining order and preliminary injunction to enjoin the Defendants—the RSU 22 School Board ("**School Board**") and its chair, Heath Miller—from prohibiting Mr. McBreairty from public comment and from enforcing the School Board's Public Participation Policy. Mr. McBreairty is seeking injunctive relief on an emergency basis because he intends to criticize RSU 22 employees by name at an upcoming School Board meeting on April 26, 2023. For the reasons outlined below, the Plaintiff's motion for a temporary restraining order and preliminary injunction is **DENIED**.

# BACKGROUND[1]

Shawn McBrearity resides in Hampden, a town within Regional School Unit 22 ("**RSU 22**"). Compl. ¶ 1 (ECF No. 1). RSU 22 is governed by the School Board, which is chaired by Defendant Heath Miller. Compl. ¶¶ 2–3. The School Board holds monthly meetings, which are open to the public to attend and are also livestreamed on RSU 22's website. Decl. of Heath Miller ("**Miller Decl.**") ¶¶ 3–4 (ECF No. 9-1). RSU 22 has enacted School Board-related policies, as permitted under Maine law, including a policy identified as "BEDH" and titled "Public Participation in Board Meetings" (the "**Public Participation Policy**").[2] Compl. Ex. A ("**Public Participation Policy**") (ECF No. 1-1). In the Public Participation Policy, the School Board "recognizes its responsibility to conduct the business of the district" and states that "the primary purpose of [School Board] meeting[s] is for the Board to conduct its business as charged by the law." Public Participation Policy 1.

Pursuant to the Public Participation Policy, "[t]he public is invited to attend Board meetings and will be given limited time to voice opinions or problems." Public Participation Policy 1. People who speak at a school board meeting are asked to

---

[1]   The following facts are drawn from the verified complaint and exhibits thereto, and the exhibits submitted with the preliminary injunction briefing. I also have reviewed the videos of the relevant school board meetings, which are referenced in the briefs and included in shortened form as exhibits, and which are publicly available online. I also considered the arguments presented at the April 25, 2023 preliminary injunction hearing.

[2]   The relevant Maine law states: "A school board shall provide the opportunity for the public to comment on school and education matters at a school board meeting. Nothing in this subsection restricts the school board from establishing reasonable standards for the public comment period, including time limits and conduct standards." 20-A M.R.S. § 1001(20).

observe several rules of conduct under the Public Participation Policy. At issue in this case is Rule 2 (the "**personnel-matter rule**"), which states:

> Confidential personnel information will not be shared in a public session. No complaints or allegations will be allowed at Board meetings concerning any person employed by the school system or against particular students. Personnel matters or complaints concerning student or staff issues will not be considered in a public meeting but will be referred through established policies and procedures.

Public Participation Policy 1. The referenced "established policies and procedures" are found in Board Policy KE (the "**Public Concerns & Complaints Policy**"), which outlines the escalating process by which citizens may raise "complaints or concerns regarding any aspect of RSU #22 or an employee thereof."[3] Miller Decl., Ex. E (ECF No. 9-6). The Public Participation Policy also states that "[a]ll speakers must observe rules of common etiquette" and "[t]he Chair may interrupt or terminate an individual's statement when it is too lengthy, personally directed, abusive, obscene, or irrelevant." Public Participation Policy 2.

A speaker who violates any of the Public Participation Policy's rules "may be required to leave in order to permit the orderly consideration of the matters for which the meeting was called." Public Participation Policy 1. The Chair of the School Board "is responsible for the orderly conduct of the meeting and shall rule on such matters as the time to be allowed for public discussion, the appropriateness of the subject

---

[3]     Citizens raising concerns under the Public Concerns & Complaints Policy are first "expected to seek a resolution at the lowest possible level" before appealing to the next level, from staff to principal to superintendent to the School Board. Decl. of Heath Miller ("**Miller Decl.**"), Ex. E (ECF No. 9-6). The Public Concerns & Complaints Policy does not apply to "complaints that concern School Board actions, operations, or policy. Such complaints should be addressed to the Board Chair." Miller Decl., Ex. E

being presented and the suitability of the time for such a presentation." Public Participation Policy 1. The Chair "has the authority to stop any presentation that violates these guidelines or the privacy rights of others," may ask anyone who disrupts a School Board meeting to leave, and "may request law enforcement assistance as necessary to restore order." Public Participation Policy 1–2.

During the public comment session at a School Board meeting on February 15, 2023, Mr. McBrearty played an audio recording of himself. Compl. ¶ 13.[4] In his recorded statement, he expressed concerns about "how horrific RSU 22 is for . . . children." Compl. Ex. C (ECF No. 1-3).[5] In the recording, Mr. McBrearty paraphrased comments that he says he received from two unnamed middle school students and an unnamed teacher at RSU 22 complaining about the treatment of the concepts of LGBTQ+ and gender identity in the schools, including what the unnamed teacher allegedly perceived as the "sexual grooming" of students. Compl. Ex. C. Mr. McBrearty then twice mentioned an RSU 22 teacher by name, and referred to her as "groomer, I mean, teacher of the year," saying that she should be locked up and not allowed within five hundred feet of a school.[6] Compl. Ex. C. At the first mention of

---

[4]    Mr. McBrearty opened by stating that he previously won a federal First Amendment lawsuit against the Chair, "galvanizing my right to say whatever I want about whomever I want in whatever medium I want." Compl. Ex. C (ECF No. 1-3). Later, in some verbal sparring with an audience member, he stated: "The absolute is I can say whatever I want as long as I don't incite violence or use obscenities. Anything I want. Anytime. Anywhere." This is incorrect. "[T]he First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. Int'l Soc'y for Krishna Consciousness*, 452 U.S. 640, 647 (1981).

[5]    The full video of the February 15, 2023 meeting is available on the RSU 22 School Board's YouTube channel at https://www.youtube.com/watch?v=EZoXb_CIxy4.

[6]    He also began saying that the named teacher participated in giving out "prizes and incentives pushed daily during announcements" but the remainder of his recorded statement is inaudible.

the teacher's name, the Chair warned Mr. McBreairty not to use names, and when Mr. McBreairty continued playing his recording about the named teacher, the Chair asked him to sit down and then called for a recess as Mr. McBreairty continued playing the recording over him. Compl. Ex. C. The full video shows that the School Board meeting recessed for approximately thirty minutes following Mr. McBreairty's statement. During this time, the School Board cut the video feed of the meeting and contacted the Hampden Police Department, and when the responding police officers eventually asked Mr. McBreairty to leave, he obliged. Compl. ¶¶ 16–17; Compl. Ex. D (ECF No. 1-4).

Mr. McBreairty then spoke at the School Board's March 15, 2023 meeting. Compl. ¶ 18. In his public comment, he again voiced concerns about specific named RSU 22 staff members. Compl. ¶ 19. He mentioned two teachers by name and complained that one teacher displayed "an LGBTQ cult war flag on the classroom wall" and that the other employee "taught sex" after school to students. Compl. Ex. E (ECF No. 1-5).[7] At the mention of the first teacher by name, the Chair gave Mr. McBreairty a warning. Compl. ¶ 20. After this warning, Mr. McBreairty spoke uninterrupted for approximately twenty seconds about issues he had with an after-school program before he mentioned the second employee by name. Compl. Ex. E. At that point, the Chair asked Mr. McBreairty to stop speaking and step down, but Mr. McBreairty continued speaking into the microphone. Compl. Ex. E. Again, the School

---

[7]      The full video of the March 15, 2023 meeting is available on the RSU 22 School Board's YouTube channel at https://www.youtube.com/watch?v=f_-snd64INc.

5

Board took a recess, cut the public video broadcast of the meeting, and contacted the police. Compl. ¶ 21; Compl. Ex. E. During this fifteen-minute recess, McBreairty did not leave the podium and kept speaking. *See* Miller Decl., Ex. G (ECF No. 9-8).[8]

On March 24, 2023, Mr. McBreairty filed his Complaint in this Court, along with his Emergency Motion for a Temporary Restraining Order and Preliminary Injunction ("**Motion**"). Emergency Mot. for a TRO and Prelim. Inj. ("**Mot.**") (ECF No. 3). The Complaint alleges that the School Board's conduct—stopping Mr. McBreairty's speech and contacting the police to remove him from RSU 22 school premises—violates his rights under the U.S. and Maine Constitutions to free speech and expression and to petition the government. Compl. ¶¶ 22–42. The Defendants filed an expedited opposition to Mr. McBreairty's motion for a temporary restraining order on April 3, 2023. Mem. of Law in Opp'n to Emergency Mot. for a TRO and Prelim. Inj. of Defs. School Board of Regional School Unit 22 and Heath Miller ("**Opp'n**") (ECF No. 9). The Plaintiff filed a reply on April 6, 2023. Pl.'s Reply in Supp. of Mot. for a TRO and Prelim. Inj. ("**Reply**") (ECF No. 10). Mr. McBreairty has expressed that he would like to speak at the next School Board meeting, which is scheduled for April 26, 2023. Mot. 1. On April 25, 2023, I held a hearing on the Plaintiff's Motion.

---

[8]     As the Chair explained in his declaration, although the public broadcast was stopped, the video recording of the School Board meeting continued, so I was able to see what occurred during the recess. *See* Miller Decl. ¶ 28 (ECF No. 9-1); Miller Decl., Ex. G (ECF No. 9-8). Mr. McBreairty did not relinquish the podium and instead continued speaking, looked things up on his phone, and engaged in arguments with other members of the public sitting in the audience. Meanwhile, as Mr. McBreairty kept talking, most of the members of the School Board vacated the room, and multiple audience members put on their coats, gathered up their belongings, and presumably left the meeting. The police eventually arrived and escorted Mr. McBreairty out.

## LEGAL STANDARD

"Injunctive relief 'is an extraordinary and drastic remedy that is never awarded as of right.'" *Monga v. Nat'l Endowment for the Arts*, 323 F. Supp. 3d 75, 82 (D. Me. 2018) (quoting *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 8–9 (1st Cir. 2012)). "[T]rial courts have wide discretion in making judgments regarding the appropriateness of" preliminary injunctive relief. *Sanchez v. Esso Standard Oil Co.,* 572 F.3d 1, 14 (1st Cir. 2009). In deciding whether to issue a temporary restraining order under Rule 65 of the Federal Rules of Civil Procedure, courts apply the same four-factor analysis that is used to evaluate a motion for a preliminary injunction.[9] *Monga*, 323 F. Supp. 3d at 82. For a court to grant injunctive relief, the court must evaluate:

> (1) whether the plaintiff is likely to succeed on the merits, (2) whether he is likely to suffer irreparable harm in the absence of immediate relief, (3) the balance of equities, and (4) whether granting the injunction is in the public interest.

*Norris ex rel. A.M. v. Cape Elizabeth Sch. Dist.*, 969 F.3d 12, 22 (1st Cir. 2020). "In the First Amendment context, the likelihood of success on the merits is the linchpin of the preliminary injunction analysis." *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 10 (1st Cir. 2012) (per curiam). The School Board "bears the

---

[9]     "Generally, the distinction between a temporary restraining order and a preliminary injunction is that the former can be awarded without notice to the other party and an opportunity to be heard." *Gladu v. Me. Dep't of Corr.*, No. 1:20-cv-00449-JDL, 2022 WL 2255947, at *1 (D. Me. June 23, 2022), *R&R adopted,* 2022 WL 3212110 (D. Me. Aug. 9, 2022). Here, the opposing party had notice, an opportunity to respond, and an adversarial hearing was held, so I treat the temporary restraining order request as now merged with the requested preliminary injunction, and I give the Plaintiff the benefit of that slightly less stringent standard. *Id.* ("A temporary restraining order . . . is an even more exceptional remedy than a preliminary injunction . . . .").

burden of proving the constitutionality of its actions," *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 816 (2000), and the Plaintiff as the movant shoulders the burden of establishing that a preliminary injunction should issue.

## DISCUSSION

## I.   The Merits of Plaintiff's First Amendment Speech Claim[10]

The First Amendment to the United States Constitution provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. The Fourteenth Amendment extends the First Amendment's restrictions to the actions of the states. *New York Times Co. v. Sullivan,* 376 U.S. 254, 277 (1964). First Amendment claims proceed in a three-step analysis. First, I must determine whether the Plaintiff's activity "is speech protected by the First Amendment." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985). If it is, I next "must identify the nature of the forum" in which the speech occurred "because the extent to which the Government may limit access depends on whether the forum is public or nonpublic." *Id.* Finally, I "must assess whether the justifications for exclusion from the relevant forum satisfy the requisite standard." *Id.*

Here, the first two steps are easily taken. The Defendants do not dispute that Mr. McBreairty's public comments at School Board meetings are protected speech.

---

[10]   "Because 'the Maine Constitution is no less restrictive than the Federal Constitution' with respect to the protections it provides for the freedom of speech," I do not separately analyze the Plaintiff's challenge under the Maine Constitution. *Cutting v. City of Portland*, No. 2:13-cv-359-GZS, 2014 WL 580155, at \*4 n.3 (D. Me. Feb. 12, 2014) (quoting *State v. Janisczak,* 579 A.2d 736, 740 (Me. 1990)), *aff'd* 802 F.3d 79 (1st Cir. 2015). I also do not address the merits of the Plaintiff's retaliation or right-to-petition claims because the Plaintiff did not raise either in his Motion. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990).

*See City of Madison, Joint Sch. Dist. No. 8 v. Wis. Emp. Rels. Comm'n*, 429 U.S. 167, 174–75 (1976) (holding that the First Amendment protects the rights of speakers at school board meetings that are opened for direct citizen involvement and permit public participation). Further, the parties agree that the public comment portion of the School Board meeting is a limited public forum. *See* Mot. 6; Opp'n 7; *see also McBreairty v. Sch. Bd. of RSU 22*, No. 1:22-cv-00206-NT, 2022 WL 2835458, at *8 (D. Me. July 20, 2022) ("Taken together, [20-A M.R.S. § 1001(20)] and the [Public Participation] Policy show that the School Board opened up a limited public forum for the purpose of inviting public comment on school-related matters.").

A limited public forum is what it sounds like—a forum that has been opened to the public but is "limited to use by certain groups or dedicated solely to the discussion of certain subjects." *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 679 n.11 (2010) (citation omitted). A restriction based on subject matter "may be permissible if it preserves the purposes of that limited forum." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 830 (1995). But "viewpoint discrimination . . . is presumed impermissible when directed against speech otherwise within the forum's limitations." *Id.*; *see Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 46 (1983) ("In addition to time, place, and manner regulations, the state may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view.").

Accordingly, the government may restrict expression in a limited public forum so long as the restriction (a) does "not discriminate against speech on the basis of viewpoint" and (b) is "reasonable in light of the purpose served by the forum." *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106–07 (2001) (internal quotation marks omitted). But "[t]he government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger*, 515 U.S. at 829. As the First Circuit has explained:

> The essence of viewpoint discrimination is not that the government incidentally prevents certain viewpoints from being heard in the course of suppressing certain general topics of speech, rather, it is a governmental intent to intervene in a way that prefers one particular viewpoint in speech over other perspectives on the same topic.

*Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 82 (1st Cir. 2004). The government discriminates based on viewpoint only if it "denies access to a speaker solely to suppress the point of view he espouses." *Id.* (quoting *Cornelius,* 473 U.S. at 806).

## A.    Facial Challenge to the Public Participation Policy

The Plaintiff alleges that the personnel-matter rule of the Public Participation Policy is a facially unconstitutional viewpoint-based restriction because it "prohibits any comments about RSU22 employees or students that the Chair deems is [*sic*] negative, while positive speech is permitted." Compl. ¶ 31.[11] At oral argument, the

---

[11]    Although the Plaintiff claims this is a facial attack, his reference to prohibited comments "that the Chair deems . . . negative" undermines that theory and suggests that he is really challenging the personnel-matter rule as it has been applied by the Chair. Nonetheless, I will review the rule to determine whether the Plaintiff is likely to succeed on his claim that this section of the Public Participation Policy is constitutionally infirm on its face.

Plaintiff clarified that he is only challenging the following bolded portions of the personnel-matter rule:

> Confidential personnel information will not be shared in a public session. **No complaints or allegations will be allowed at Board meetings concerning any person employed by the school system** or against particular students. Personnel matters or **complaints concerning** student or **staff issues** will not be considered in a public meeting but will be referred through established policies and procedures.

Public Participation Policy 1 (emphasis added). The Plaintiff challenges these parts of the personnel-matter rule on the ground that they render the rule viewpoint-based because it "permits discussion of personnel matters, so long as they are not negative." Reply 4.

The problem is that the Plaintiff's approach takes too myopic a view. "Courts have a 'duty to construe statutes, not isolated provisions.'" *Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 290 (2010) (quoting *Gustafson v. Alloyd Co.,* 513 U.S. 561, 568 (1995)). The Plaintiff urges me to look only at the rule's references to "complaints," but that would require treating those phrases "as islands unto themselves," *Graham Cnty.*, 559 U.S. at 290, and the court's "task is to fit, if possible, all parts into an harmonious whole," *FTC v. Mandel Bros., Inc.*, 359 U.S. 385, 389 (1959). Here, the personnel-matter rule contains many specifics about what will not be permitted at a School Board public meeting, like confidential personnel information[12] and complaints and allegations concerning staff members or students. But, importantly, the personnel matter rule also states: "*Personnel matters*

---

[12]    *See* 20-A M.R.S. § 6101(2) (listing employee information that must be kept confidential).

or complaints concerning student or staff issues *will not be considered in a public meeting* but will be referred through established policies and procedures." Public Participation Policy 1 (emphasis added). Therefore, when I read Rule 2 of the Public Participation Policy as a harmonious whole, it prohibits broader content than just complaints or negative comments; it prohibits the category of speech that falls under personnel matters. In other words, "personnel matters" encompasses and subsumes the more specific references to complaints and allegations, and presumably means *all* matters relating to school personnel, regardless of whether they are complimentary or critical of the RSU 22 employee in question.

Further, under the canon of constitutional avoidance, when a question is raised about the constitutionality of an ambiguous statute, I must "first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Jennings v. Rodriguez*, 138 S. Ct. 830, 842 (2018); *see United States v. Booker*, 644 F.3d 12, 22 (1st Cir. 2011) ("[T]he doctrine . . . comes into play when there are two plausible constructions of a statute; the absence of any ambiguity defeats the constitutional avoidance argument." (citation and internal quotation marks omitted)). If a "construction of the statute is fairly possible by which the [constitutional] question may be avoided," I should adopt that construction. *Jennings*, 138 S. Ct. at 842; *see also Iancu v. Brunetti*, 139 S. Ct. 2294, 2301 (2019) ("Th[e] Court, of course, may interpret ambiguous statutory language to avoid serious constitutional doubts.") (citation and internal quotation marks omitted).

There is no denying that the personnel-matter rule is not a model of clarity. For example, it contains some ambiguities, inexplicable redundancies, and overlap. [13] Regardless, the personnel-matter rule can be construed in a manner which is constitutional. How teachers perform their duties can readily be seen as "personnel matters." So I read the personnel-matter rule as restricting at a School Board meeting any discussion—whether complimentary or critical—involving the performance of named RSU 22 teachers and staff. Under my reading of the rule, members of the public can still express their pleasure or displeasure with what is happening at the schools, including what is being taught or not taught, but they cannot call out a named teacher either for praise or criticism. That sort of feedback concerns the teacher's performance as an employee and thus constitutes a comment about a personnel matter, which must be "referred through established policies and procedures." Public Participation Policy 1; *see* Public Concerns & Complaints Policy.

In support of his position, the Plaintiff cites to a recent case in the Eastern District of Pennsylvania. The policy at issue in that case permitted the school board's presiding officer to terminate public comments deemed "too lengthy, personally directed, abusive, obscene, or irrelevant." *Marshall v. Amuso*, 571 F. Supp. 3d 412, 418 (E.D. Pa. 2021). In applying the policy, the board allowed "positive and

---

[13]     For example, the personnel-matter rule first states: "No complaints or allegations will be allowed at Board meetings concerning any person employed by the school system or against particular students." And then in the very next sentence, the rule reiterates: "[C]omplaints concerning student or staff issues will not be considered in a public meeting . . . ." Public Participation Policy 1.

complimentary personally-directed comments supportive of Board and school employees" but prohibited "negative, challenging, or critical personally-directed comments." *Id.* at 422. The *Marshall* court held that this distinction constituted impermissible viewpoint discrimination. *Id.* This case is readily distinguishable from *Marshall* on its facts, however, because the *Marshall* court was not construing a personnel-matter provision like the one at issue here. Further, with respect to the as-applied challenge involved in *Marshall*, the school board there was interpreting its policy to permit praise and prohibit criticism. Here, although the Public Participation Policy expressly states that critical comments of staff are not allowed, it does not say that positive comments are permitted. It prohibits public discussion of personnel matters, and public discussion of "personnel matters" can be construed to cover both critical and complimentary comments.

For their part, the Defendants argue that the rule is not discriminatory on the basis of viewpoint because the rule "restricts allegations of wrongdoing, personal attacks, and criticisms of, on, or against specifically named educators without regard to the content of that allegation or the speaker's perspective." Opp'n 9. They point to other courts that have held that restrictions prohibiting discussion of personnel matters during the public comment portion of government meetings are constitutionally permissible.

In *Pollak v. Wilson*, No. 22-8017, 2022 WL 17958787 (10th Cir. Dec. 27, 2022), the Tenth Circuit upheld the district court's denial of a plaintiff's motion for a preliminary injunction based on a similar First Amendment claim. Under the school

board policy at issue, "[p]ersonnel matters are not appropriate topics to be discussed at regular board meetings." *Id.* at *2. When the plaintiff mentioned a school employee by name during the public comment period, the chair "seized on the mention of [the employee's] name as making a comment on a personnel matter, proceeded to shut down [the plaintiff]'s comment, and had [the plaintiff] removed from the premises." *Id.* at *3 (internal quotation marks omitted). Like Mr. McBreairty, the plaintiff challenged the constitutionality of the policy both facially and as it was applied to him, arguing that the school board engaged in viewpoint discrimination because "favorable comments about school employees were welcome, while unfavorable speech was a banned 'personnel matter.'" *Id.* at *4.

The Tenth Circuit held that the personnel-matter restriction was facially viewpoint neutral because it "prohibits the discussion of a subject—personnel matters—but does not draw a distinction based on viewpoint." *Id.* at *7; *see id.* at *8 ("[T]he text of the Policy is viewpoint neutral because it forbids discussion of all personnel matters, regardless of the speakers' perspective."). It also concluded that, in light of the purpose served by board meetings (conducting the official business of the school district), the policy "reasonably prevents discussion of personnel matters during the public comment period." *Id.* The Tenth Circuit held that the board "establish[ed] the reasonableness of the Policy's personnel-matter restriction" given the purpose of the school board meetings and the board's stated need to protect personal information. *Id.* at *9. Because the school board had shown "the personnel-matter restriction is viewpoint neutral and reasonable," the district court "did not

abuse its discretion in concluding that [the plaintiff] had not shown a substantial likelihood of success on the merits of this claim." *Id.* at *11.

Likewise, in *Fairchild v. Liberty Independent School District*, 597 F.3d 747 (5th Cir. 2010), the Fifth Circuit found personnel-matter restrictions to be constitutional under the limited public forum analysis. In that case, the school board policies "exclude[d] from public discourse certain topics of speech—including individualized personnel matters—which the Board channels into more effective dispute resolution arenas, before it hears the matter and resolves it." *Id.* at 759. The Fifth Circuit held that the policies "plainly" were "both viewpoint-neutral and reasonable in light of the forum's purpose." *Id.* at 760. The court reasoned that there was no evidence that the school board discriminated "based on the view or identity of a given speaker" because "[a] speaker may discuss concerns generally (as [the plaintiff] did)," and that the rule was reasonable because the school board had "a legitimate interest, if not state-law duty, to protect student and teacher privacy and to avoid naming or shaming as potential frustration of its conduct of business." *Id.* Similarly, in *Prestopnik v. Whelan*, 83 F. App'x 363 (2d Cir. 2003), the Second Circuit affirmed a district court's finding that a teacher's First Amendment rights had not been violated by a school board's refusal to allow her to speak, through counsel, about her tenure issue during the public comment portion of a meeting. The school board policy in that case "explicitly exclude[d] speech about specific personnel decisions" and the plaintiff had not shown that the policies "either were not viewpoint neutral or were unreasonable." *Id.* at 365.

Here, I find that the Defendants have met their burden of demonstrating that the personnel-matter rule contained in the Public Participation Policy is likely to be found constitutional on its face. Although, as noted above, the rule could have been better written, it expressly prohibits discussion of any personnel matters during the public comment portion of the RSU 22 School Board meetings. I find the decisions of the Courts of Appeals to be persuasive and agree that "personnel matters" is likely a viewpoint-neutral restriction because it does not take into account the speaker's view but instead prohibits all personnel-related comments, whether positive or negative.[14]

---

[14]    Even if I were to read the personnel-matter rule more narrowly and analyze only the restriction against raising "complaints or allegations" about school staff or students, the rule is likely still constitutional. In *Ridley v. Massachusetts Bay Transportation Authority*, 390 F.3d 65, 91 (1st Cir. 2004, the First Circuit upheld an MBTA regulation that governed the type of advertising that would be allowed in buses and subway cars and "prohibit[ed] the use of advertisements that 'demean or disparage an individual or group of individuals,' without listing any particular protected groups . . . ." The First Circuit stated "the guideline is just a ground rule: there is no viewpoint discrimination in the guideline because the state is not attempting to give one group an advantage over another in the marketplace of ideas." *Id.* It explained that, although "[s]ome kinds of content (demeaning and disparaging remarks) are being disfavored, . . . no viewpoint is being preferred over another" because "[a]ll advertisers on all sides of all questions are allowed to positively promote their own perspective and even to criticize other positions so long as they do not use demeaning speech in their attacks." *Id.* So too here. Mr. McBreairty and other critical speakers are free to promote their perspectives and to complain about the positions taken by RSU employees so long as they do not identify individuals in their attacks. "Reasonable ground rules, so long as they are not intended to give one side an advantage over another, can be set without falling prey to viewpoint discrimination." *Id.* at 91–92.

       One wrinkle is that the First Circuit decided *Ridley* before the Supreme Court's decisions in *Matal v. Tam*, 582 U.S. 218 (2017) and *Iancu v. Brunetti*, 139 S. Ct. 2294 (2019). But those cases—both involving trademark applications—are distinguishable. In *Tam* the Court analyzed a provision of the Lanham Act that prohibited the registration of trademarks that may "disparage persons . . . or bring them into contempt or disrepute" and held that the provision was facially unconstitutional because "[i]t offends a bedrock First Amendment principle: Speech may not be banned on the ground that it expresses ideas that offend." 582 U.S. at 223, 227. "Giving offense is a viewpoint," so denying registration to any mark that offends a particular group "is viewpoint discrimination." *Id.* at 243. Similarly, in *Brunetti*, the Court held that another Lanham Act provision, this one prohibiting the registration of "immoral or scandalous" trademarks, violated the First Amendment for the same reason, that it "disfavors certain ideas." 139 S. Ct. at 2297. The *Brunetti* Court explained that the statute was viewpoint-based, not viewpoint neutral, on its face, because it "distinguishes between two opposing sets of ideas" and favors  "those aligned with conventional moral standards and . . . those inducing societal nods of approval" while disfavoring those hostile to them[ ] and those provoking offense and condemnation. *Id.* at 2299–2300. The personnel-matter rule challenged by Mr. McBreairty, however, does not on its face prohibit comments that give offense, or permit praise while disallowing complaint. Here, unlike in these two trademark cases, the offensive ideas themselves are not banned,

I also find that the restriction is likely to be found reasonable. The primary purpose of the School Board meetings is for the School Board to conduct the business of the school district. Permitting anyone with a comment about a particular individual at the school to voice it at a School Board meeting "could derail the agenda for the meeting and risk unnecessary disclosure of private information about employees or students." *Fairchild*, 597 F.3d at 760.[15] Further, alternative channels for such speech are available. Mr. McBreairty could voice his displeasure—as he has done repeatedly—without naming specific individual employees. Or he could raise his concerns about individuals under RSU 22's Public Concerns & Complaints Policy, which provides the process for such grievances. As the Fifth Circuit put it, that "leaves the public ample opportunity to be heard—just not here and now." *Id.*[16]

---

only the connecting of those complaints to "any person employed by the school system or . . . particular students." Public Participation Policy 1. In addition, when asked to distinguish *Tam* and *Brunetti* at oral argument, counsel for the Defendants pointed out that both cases involved trademark registrations, not singling out people at a school board meeting. A school board meeting is a limited public forum, and the First Amendment must be understood in the context of the forum at issue. *See, e.g.*, *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799–800 (1985) (explaining that "[n]othing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property  without regard to the nature of the property or to the disruption that might be caused by the speaker's activities" and "the extent to which the Government can control access depends on the nature of the relevant forum"). Therefore, the personnel-matter rule is likely viewpoint neutral.

[15]    That sort of derailing is what occurred in February and March when the Board had to take recesses totaling forty-five minutes before resuming its agenda when Mr. McBreairty broke the rules during those two meetings.

[16]    Before leaving the Plaintiff's facial challenge, two additional points bear mentioning. First, in his Complaint, the Plaintiff alleges that the personnel-matter rule is unconstitutionally vague, Compl. ¶ 30 (ECF No. 1), but then neglects to raise any vagueness argument again until his reply brief, *see* Reply 5–6. "But, arguments developed for the first time in a reply brief are waived." *Small Just. LLC v. Xcentric Ventures LLC*, 873 F.3d 313, 323 n.11 (1st Cir. 2017). Second, the Defendants suggest that the Plaintiff's viewpoint-discrimination argument will soon be mooted because the Public Participation Policy has been amended "to make crystal clear that the restriction on comments relating to 'personnel matters' prohibits any public comments related to named RSU 22 employees," and the amended policy is expected to be adopted by the School Board in May. But in considering the Plaintiff's Motion, I am concerned with the version of the Public Participation Policy that is currently in force and that will be

### B.   As-Applied Free Speech Claim

The Plaintiff alleges that the personnel-matter rule of the Public Participation Policy has been unconstitutionally applied to Mr. McBreairty because other members of the public are permitted to address their opinions about teachers but Mr. McBreairty has been silenced and ordered to leave. Compl. ¶ 32. He also suggests that the personnel-matter rule "seems to only be used to stop criticism" and thus it has not been applied in a viewpoint-neutral way. Mot. 12 n.2. The Defendants counter that Mr. McBreairty's speech was not interrupted based on his viewpoint, but because he named individual school personnel. Opp'n 17.

In an as-applied challenge, I must consider the constitutionality of a statute as it was "applied in a particular instance." *Reno v. Flores*, 507 U.S. 292, 300 (1993). The constitutional test I use is the same for this as-applied challenge as it is for the facial challenge—the School Board must apply the personnel-matter rule in a way that is both viewpoint neutral and reasonable. Here, the Chair stopped Mr. McBreairty's public remarks and had him removed from the School Board meetings in February and in March. I have watched the entire public comment portion of both meetings. At the beginning of each meeting, the Chair read out the ground rules for public comment. During the public comment period of the February meeting, three speakers (including Mr. McBreairty) addressed the School Board. The other two speakers raised concerns similar to those voiced by Mr. McBreairty, about the school allegedly

---

enforced at the upcoming April meeting. Therefore, the anticipated amended policy plays no role at this preliminary injunction stage of the litigation, and I need not determine if or how the voluntary-cessation doctrine applies to the ultimate merits of the Plaintiff's claims in this case.

"pushing" certain sexual ideologies, hypersexualizing children, encouraging students to question gender identities, and teaching material the speakers did not agree with. Only Mr. McBreairty was interrupted and removed from the meeting, but only Mr. McBreairty broke the School Board's personnel-matter rule and named a specific RSU 22 teacher. Neither of the other two speakers identified RSU 22 personnel by name, and they were allowed to give their full statements, which closely matched the viewpoint that Mr. McBreairty expressed. The School Board even thanked one speaker, a legislative representative for some of the towns within the RSU 22 school district, for her service as representative. Mr. McBreairty himself was allowed to fully express his opinion, criticizing RSU 22, until he mentioned the RSU 22 employee by name thereby violating the personnel-matter rule, and even then, he was given one verbal warning by the Chair before he was asked to stop speaking.

Similarly, at the March meeting, there were three additional speakers during the public comment portion. Two of three speakers again espoused views like Mr. McBreairty's, discussing their alleged concerns about sexual predators being in the schools, RSU 22 promoting books with sexual content, students being exposed to suggestive ideology about their gender identities, and the schools waging an assault on parental rights. Neither of these public commenters identified any RSU 22 staff or students by name so they were permitted to fully voice their opinions.[17] Mr. McBreairty expressed displeasure with the School Board and its members, and he

---

[17]     The third additional speaker did not share these views, but he too refrained from naming any names and thus was allowed to speak.

was allowed to complain about their past actions and to criticize the Chair. He also was permitted to voice his disagreement with the books in the library, the RSU 22 strategic plan, the current superintendent, students' math scores, a flag hanging on a classroom wall, certain afterschool programming he disliked, a national organization of so-called "groomers," and students being able to discuss sex during extracurriculars. It was only when he mentioned a teacher by name that he was interrupted with a warning, and it was only when he named a second RSU 22 employee that the Chair cut off Mr. McBreairty's time at the podium and took a recess. Contrary to Mr. McBreairty's contention, the record unequivocally reveals that he was not shut down because of his viewpoint. He was shut down because he—unlike any of the other speakers—could not follow the School Board's rules for public comment. As the Plaintiff admits in his Motion, "[t]he moment Mr. McBreairty uttered an employee's name, [Chair] Miller immediately interrupted him." Mot. 11; *see also* Mot. 10 ("McBreairty was stopped by Defendants from speaking for even *mentioning the name of an employee*, even prior to uttering any criticism."). So it was McBreairty's repeated use of employees' names in violation of the rule, not his viewpoint, that prompted the Chair's actions. *See Moms for Liberty – Brevard Cnty.*, 582 F. Supp. 3d 1214, 1220 (M.D. Fla. 2022) (upholding a similar policy that was "was evenhandedly applied as a whole" where the Chair let commenters "purportedly disaligned with her view speak uninterrupted when they followed the policy"), *aff'd*, 2022 WL 17091924 (11th Cir. Nov. 21, 2022).

There is only one example in the record that arguably shows a speaker violating the personnel-matter rule and being treated differently than Mr. McBreairty. During the October 2022 School Board meeting, the program director for Educate Maine, which conducts the Maine Teacher of the Year program, recognized that an RSU 22 employee had received the award. She "provided an assessment of [the named teacher]'s services as the 2022 Maine Teacher of the Year, including referring to her as 'thoughtful,' 'intentional,' 'brave,' and 'brilliant.' " Compl. ¶ 10.[18] According to the Plaintiff, this proves that the School Board engages in viewpoint discrimination because it permits praise of teachers but prohibits criticism. Reply 2. But the October meeting does not help the Plaintiff for several reasons.

First, in the fall of 2022, the Public Participation Policy was applied to Mr. McBreairty in the same way it was applied to the Educate Maine speaker and others. Specifically, at the September 2022 meeting, at which Mr. McBreairty and three other speakers shared comments, Mr. McBreairty named several RSU 22 school counselors and one teacher by name. Miller Decl., Ex. F (ECF No. 9-7). The Chair did not interrupt him. Further, the Chair did not realize until several months later that the policy prevented positive feedback relating to personnel matters just as it prohibited complaints. Miller Decl. ¶¶ 17–20. Since then, the record reflects that he continued to apply the personnel-matter rule in an even-handed, non-viewpoint-

---

[18]      In the video of the October 2022 meeting, the Educate Maine director also told the School Board that, during the RSU teacher's reign as 2022 Maine Teacher of the Year, the organization "feared for her safety" so much that "at every public-facing event" the organization "had police or security present because ill-intentioned people made ludicrous accusations about her" and they did not know "if these preposterous claims would spur someone to harm her."

discriminatory way, now cutting off speakers at the mention of identified RSU 22 personnel. And the fact that the Chair may have mistakenly permitted the identified-by-name Teacher of the Year comments at one meeting in 2022 does not mean that he had to also allow Mr. McBrearty to name teachers at the February and March 2023 meetings. *See Ridley*, 390 F.3d at 92 (noting that even if the transportation authority "made a mistake under its guidelines" by accepting two earlier ads, that "does not mean it was required to accept the third ad").

In addition, the Public Participation Policy contains more than just the personnel-matter rule. It also provides that "[t]he Chair may interrupt or terminate an individual's statement when it is too lengthy, *personally directed*, abusive, obscene, or irrelevant." Public Participation Policy 2 (emphasis added). The Chair never specifies which provision—the personnel-matter rule or the "personally directed" rule—he was relying on when he told Mr. McBrearty he could not name individual staff members. A nearly identical policy provision was at issue in a recent district court case out of Florida. *See Moms for Liberty*, 582 F. Supp. 3d at 1217. In that case, the plaintiffs sought a preliminary injunction based on the school board's policy, which they alleged was unconstitutional facially and as applied. *Id.* at 1218. The court found that the policy, which allowed the chair to interrupt speech when it is "too lengthy, personally directed, abusive, obscene, or irrelevant," was viewpoint neutral on its face and was "critical to prevent disruption, preserve reasonable decorum, and facilitate an orderly meeting." *Id.* at 1219 (internal quotation marks omitted). The record in that case also showed that the policy "was evenhandedly

applied" and the chair let commenters "purportedly disaligned with her view speak uninterrupted when they followed the policy." *Id.* at 1220. Further, the court determined that one noncompliant speaker was "permissibly excluded" because his speech was "abusive and disruptive" and he refused to stop speaking after being warned by the chair that he was "pushing the limit." *Id.* On appeal, the Eleventh Circuit affirmed "the district court's thorough, well-reasoned order." *Moms for Liberty – Brevard Cnty. v. Brevard Pub. Schs.*, No. 22-10297, 2022 WL 17091924, at *1 (11th Cir. Nov. 21, 2022).

Here, in Mr. McBreairty's case, the Chair interrupted Mr. McBreairty only when he personally directed his comments to specific named employees. The Chair reviewed the rules of the Public Participation Policy at the meetings before opening up the public comment sessions, and he warned Mr. McBreairty specifically on both the February and March occasions to refrain from using names. Both times, Mr. McBreairty ignored the Chair's warning and continued speaking about named individuals. And it was only because Mr. McBreairty continued speaking and refused to sit down that the School Board recessed, asked him to leave, and called the police. Based on my review of the videos of the February and March School Board meetings, it appears that Mr. McBreairty was willfully disobeying the rules of the Public Participation Policy. On both occasions he had preplanned what he was going to say; in February he played a previously recorded statement from his phone and in March he read from a written statement. So he did not inadvertently slip up at the podium by mentioning those staff members by name. Further, according to his Motion, he

plans to criticize RSU 22 employees by name again at the next meeting. Mot. 1. This type of personally directed speech is expressly prohibited under the Public Participation Policy, and the Chair applied the policy in an evenhanded viewpoint-neutral way. He allowed Mr. McBreairty to criticize staff members anonymously and only interrupted Mr. McBreairty's critiques when he mentioned names. Yet he permitted other members of the public, who seemingly shared Mr. McBreairty's general negative views of the goings-on at RSU 22 schools, to speak because they followed the rules. It is clear from the record that the School Board is not suppressing Mr. McBreairty's speech, which he was free to publicly share within the confines of the Public Participation Policy, based on his viewpoint.

I also find that the way the School Board applied the policy was reasonable. As noted above, RSU 22's School Board meetings are primarily held to allow the Board to conduct the business of the school district "in an orderly and efficient manner." Public Participation Policy 1. Although the Public Participation Policy invites members of the public to attend and to voice their opinions, the public comment period is not the main focus of the School Board's business during its meetings. The restriction placed on Mr. McBreairty (and all public speakers) permits complaints and criticisms of RSU 22 and its employees generally, as long as individual personnel are not identified in these public comments. During the February and March meetings, the Chair stayed within the bounds of the policy and did not interrupt Mr. McBreairty's speech until he identified RSU 22 employees by name. *See Davison v. Rose*, 19 F.4th 626, 636 (4th Cir. 2021) ("[D]enying a speaker at the podium in a . . .

hearing the right to launch personal attacks does not interfere with what that speaker could say without employing such attacks." (quoting *Steinburg v. Chesterfield Cnty. Planning Comm'n*, 527 F.23d 377, 387 (4th Cir. 2008))). Even then, he was first given warnings that he was not to name individuals. It was only when Mr. McBreairty crossed the line and became disruptive—not following the personnel-matter rule, both written and as announced orally by the Chair at the start of the meeting, and leveling personally directed attacks at RSU 22 employees; not heeding the Chair's warning during Mr. McBreairty's comments to not use names and continuing to name individuals over the Chair's admonishment; not obeying the direction of the Chair when he told Mr. McBreairty to stop speaking and sit down—that Mr. McBreairty was asked to leave. Because Mr. McBreairty disrupted the ability of the School Board to conduct its meeting in an orderly and efficient way, the Chair's response under the policy was reasonable, particularly in light of the School Board's statutory obligation to ensure the safety of its employees and to protect their personal information.

For all these reasons, I find that the Plaintiff is unlikely to succeed on the merits of his constitutional challenge to the personnel-matter rule and the way in which the School Board applied the Public Participation Policy to Mr. McBreairty.

## II.   Remaining Factors

Likelihood of success, which the Plaintiff here lacks, "is the main bearing wall of th[e preliminary injunction] framework." *W Holding Co. v. AIG Ins. Co.-P.R.*, 748 F.3d 377, 383 (1st Cir. 2014). "[I]f the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle

curiosity." *Esso Standard Oil Co. (P.R.) v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006). I will not dwell on the other factors, but they are worth mentioning.

### A.    Irreparable Harm

Irreparable harm is measured on "a sliding scale, working in conjunction with a moving party's likelihood of success on the merits, such that the strength of the showing necessary on irreparable harm depends in part on the degree of likelihood of success shown." *Braintree Lab'ys, Inc. v. Citigroup Glob. Mkts. Inc.*, 622 F.3d 36, 42–43 (1st Cir. 2010) (internal citation and quotation marks omitted). Although "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Fortuño*, 699 F.3d at 10–11 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)), here I have found that the Plaintiff is unlikely to succeed on the merits of his First Amendment claims. Further, the Plaintiff's alleged harm absent injunctive relief—his inability to criticize named RSU 22 staff at School Board meetings—is mitigated  because Mr. McBreairty is free either to continue to voice his concerns at School Board meetings in accordance with the Public Participation Policy (i.e., speak his piece but refrain from identifying individuals) or to lodge his personally directed complaints in accordance with the Public Concerns & Complaints Policy (i.e., critique the named employee in that forum and seek resolution from school staff before appealing to the principal, superintendent, and School Board).[19]

---

[19]    It bears mention that, rather than seeking run-of-the-mill injunctive relief to preserve the status quo until the merits are resolved, the Plaintiff here seeks to change the current state of affairs. He is asking me to force the School Board to effectively change its policy as he wants, to allow him to criticize teachers by name during public comment at meetings, which is not permitted now. "Because a mandatory preliminary injunction alters rather than preserves the status quo, it normally should be granted only in those circumstances when the exigencies of the situation demand such relief." *Atl. Salmon Fed'n U.S. v. Merimil Ltd. P'ship*, No. 1:21-cv-00257-JDL, 2022 WL 558358, at *4 (D. Me. Feb.

### B.   Balance of Harms and Public Interest

As to the balance-of-harms inquiry, that too favors the Defendants. I balance the minimal viewpoint-neutral and reasonable interference with Mr. McBreairty's right to unfettered free speech—outlined above—against the harm the School Board will suffer if an injunction is granted. As I have previously observed, there is no question that the School Board's interest—conducting the orderly and undisrupted business of the School Board, governing RSU 22's public school system—is significant. In addition, the Defendants point to their interest, and statutory obligation, in protecting RSU 22's employees from harassment and bullying and in shielding RSU 22 from potential defamation claims. Meanwhile, the Plaintiff can still say whatever he wants about the schools and what is being taught; he just cannot name individuals in this forum and instead has to provide such comments through the forum established by the Public Concerns & Complaints Policy. The balance-of-harms factor thus strongly favors the Defendants.

As to the public interest, on the one hand, "[p]rotecting rights to free speech is ipso facto in the interest of the general public." *Cutting v. City of Portland*, No. 2:13-cv-359-GZS, 2014 WL 580155, at *10 (D. Me. Feb. 12, 2014) (internal quotation marks omitted), *aff'd*, 802 F.3d 79 (1st Cir. 2015). But on the other hand, "the First Amendment does not require endless public commentary," the Maine Legislature has

---

24, 2022) (quoting *Man Against Xtinction v. Comm'r of Me. Dep't of Marine Res.*, 478 F. Supp. 3d 67, 71 (D. Me. 2020)). "Nevertheless, those exigencies should still be measured according to the same four-factor test, as the focus always must be on prevention of injury by a proper order, not merely on preservation of the status quo." *Braintree Lab'ys, Inc. v. Citigroup Glob. Mkts. Inc.*, 622 F.3d 36, 41 (1st Cir. 2010) (internal quotation marks omitted).

28

established there is a substantial public interest in keeping RSU 22's educators safe, and "there is a significant public interest in the School Board conducting orderly public business." *Moms for Liberty*, 582 F. Supp. 3d at 1221 n.13. Granting the Plaintiff his requested injunctive relief would frustrate these public interests. Indeed, the public has already suffered from Mr. McBreairty's behavior at meetings. When Mr. McBreairty refused to cede the floor at the last meeting, School Board members were left no choice but to temporarily abandon the business of the meeting. In addition, public audience members (who presumably attended that meeting to observe the School Board conduct its business) put on their coats and left rather than wait out Mr. McBreairty's removal, and at-home viewers likewise could have tuned out and not returned to the interrupted broadcast. Therefore, I find that denying the preliminary injunction is in the public interest.

## CONCLUSION

For the reasons stated above, the Court **DENIES** the Plaintiff's motion for a temporary restraining order and preliminary injunction.


SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 26th day of April, 2023.